[656 NYS2d 16]

CYNTHIA SOWELL, Respondent, v BAUSCH & LOMB, INC., Appellant, and COHEN FASHION OPTICAL, INC., Respondent, et al., Defendants.

First Department, April 10, 1997

## APPEARANCES OF COUNSEL

*Stephen C. Glasser* of counsel *(Thomas M. Gannon* on the brief; *Sullivan & Liapakis, P. C.,* attorneys), for Cynthia Sowell, respondent.

*Harry P. Sacks* of counsel *(Steven J. Brill* on the brief; *Sacks Montgomery, P. C.,* attorneys), for appellant.

*Cynthia L. Marks* of counsel *(Dale A. Hunte* on the brief; *Brody & Fabiani,* attorneys), for Cohen Fashion Optical, Inc., respondent.

## OPINION OF THE COURT

ELLERIN, J.

The issue before us on this appeal is whether plaintiff's State law tort claims are preempted by Federal law.

The plaintiff, Cynthia Sowell, alleges that she sustained serious physical injury to her eyes due to the use of extended wear contact lenses which were manufactured by defendant-appellant Bausch & Lomb and were prescribed and sold to her by defendant Cohen Fashion Optical. Plaintiff has asserted four causes of action against Bausch & Lomb: i.e., negligence in the design, manufacture, production, testing, examination, inspection, distribution and delivery of the device; breach of express warranties; breach of implied warranties; and a strict products liability claim alleging that the product was defective and unreasonably dangerous. Bausch & Lomb moved for summary judgment dismissing the complaint on the ground that all of plaintiff's causes of action were barred by Federal preemption. The IAS Court denied this motion, and Bausch & Lomb now appeals.

The sale and distribution of medical devices such as the contact lenses here in issue are governed by that portion of the Federal Food, Drug, and Cosmetic Act of 1938 known as the Medical Device Amendments of 1976 ([MDA] 21 USC § 360c *et seq.*). The statutory scheme separates medical devices into three categories. Class I medical devices are those which pose little or no threat to public health and are subject only to "general controls" related to their manufacture (21 USC § 360c [a] [1] [A]; 21 CFR 860.3 [c] [1]). They include devices such as tongue depressors. Class II medical devices, such as tampons and oxygen masks, are those which pose some risk of injury. In ad-

dition to the above-mentioned general controls, they are also subject to "special controls", including performance standards, use guidelines and postmarket surveillance programs (21 USC § 360c [a] [1] [B]; 21 CFR 860.3 [c] [2]).

It is undisputed that the device involved herein, extended wear contact lenses, constitutes a Class III medical device, i.e., one which presents a "potential[ly] unreasonable risk of illness or injury" or which is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" (21 USC § 360c [a] [1] [C] [ii]; 21 CFR 860.3 [c] [3]). The general rule applicable to distributors of Class III medical devices requires them to obtain premarket approval (PMA) of the device before marketing it (21 USC § 360e; 21 CFR 814.1 [c]; 860.3 [c] [3]). Before a PMA will be granted, the Federal Food and Drug Administration (FDA) conducts a "rigorous" review of the product, involving the submission by manufacturers of "detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission" (*Medtronic, Inc. v Lohr*, 518 US —, —, 116 S Ct 2240, 2247, citing Hearings before Subcomm on Health and Envt of House Comm on Energy and Commerce, 100th Cong, 1st Sess [Ser No. 100-34], at 384 [1987]).[1] In addition, significant postmarket regulation may be imposed upon Class III devices going far beyond the relatively unintrusive postmarket surveillance required of Class II de-

---

1. The PMA application must contain:

"(A) full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective;

"(B) a full statement of the components, ingredients, and properties and of the principle or principles of operation, of such device;

"(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device;

"(D) an identifying reference to any performance standard under [section 360d of this title] which would be applicable to any aspect of such device if it were a class II device, and either adequate information to show that such aspect of such device fully meets such performance standard or adequate information to justify any deviation from such standard;

"(E) such samples of such device and of components thereof as the Secretary may reasonably require, except that where the submission of such samples is impracticable or unduly burdensome, the requirement of this subparagraph may be met by the submission of complete information concerning the location of one or more such devices readily available for examination and testing;

"(F) specimens of the labeling proposed to be used for such device; and

vices, and the FDA retains the right to withdraw the PMA if it subsequently determines that a device previously approved is unsafe or ineffective (21 USC § 360e [e]).

Notwithstanding this rigorous and detailed statutory scheme, the large majority of Class III devices currently on the market have never received premarket approval from the FDA because of two exceptions to the requirements of the Act. First, devices that were already on the market at the time of the passage of the MDA were "grandfathered" in without the necessity of a PMA review until such time as the FDA chooses to initiate and complete a PMA (see, 21 USC § 360e [b] [1] [A]; 21 CFR 814.1 [c] [1]). Moreover, an exception from the PMA process also exists for products which are found by the FDA to be "substantially equivalent" to devices already on the market prior to the effective date of the MDA (21 USC § 360e [b] [1] [B]). In such cases, a much less extensive premarket notification process (also known as a "510 [k] review", after the number of the section in the original Act), which generally requires no more than 20 hours to complete, is permitted to establish such substantial equivalence (*Medtronic, Inc. v Lohr*, 518 US, *supra*, at —, 116 S Ct, *supra*, at 2247). Once it is established, the marketer is only required to comply with the aforementioned general controls, which are applicable to all three classes of medical devices, and which include FDA regulations setting forth "good manufacturing practices", i.e., general requirements for most of the steps involved in every device's manufacture (21 CFR 820.20 *et seq.*) and FDA labeling regulations, which require various types of warnings to be affixed to devices (21 CFR 801.109).[2]

In this case, since the device sought to be marketed by Bausch & Lomb, i.e., extended wear contact lenses, was not substantially equivalent to a device already on the market and therefore not eligible for the less rigorous premarket notification process, Bausch & Lomb was required, under 21 USC § 360e, to submit a full PMA application.

There is no dispute that Bausch & Lomb's PMA application underwent a comprehensive review requiring the submission

---

"(G) such other information relevant to the subject matter of the application as the Secretary, with the concurrence of the appropriate panel under [section 360c of this title], may require." (21 USC § 360e [c] [1].)

2. Another, less widely used, exception to the PMA requirement exists for Class III devices which receive an "Investigational Device Exemption" from the FDA permitting testing on human subjects without a PMA (21 USC § 360e [a]; § 360j [g]).

by Bausch & Lomb of extensive, detailed information regarding the contact lenses and their manufacture. In response to that application, Bausch & Lomb was advised, on July 25, 1983, that the application had been granted. In addition, Bausch & Lomb was advised of various conditions to the approval of the marketing of the lenses, including that the sale and distribution of the lenses were to be restricted to prescription use, that Bausch & Lomb was to continue clinical studies on patients and submit the data to the Food and Drug Administration and that Bausch & Lomb could not make any changes in the design, manufacturing, labeling, packaging, quality control methods, suppliers or distributors, unless it submitted a supplemental PMA application to the FDA for approval. Bausch & Lomb was also required to submit to the FDA reports on any adverse reactions or defects involving the lenses, in addition to periodic reports indicating new information about the lenses, such as scientific literature.

Since the MDA include no provision for a private cause of action by a person injured by a medical device, when plaintiff brought this action, arguing that the contact lenses had caused injury to her eyes, her claims were necessarily limited to State law causes of action and, as indicated, sought recovery based on negligence, breach of express and implied warranties and strict products liability. In response, Bausch & Lomb asserted as a defense that, since the lenses had received a PMA prior to their entering the market, all of plaintiff's State causes of action were preempted by Federal law.

Although Federal law is the "supreme Law of the Land" (US Const, art VI, cl 2) and will render "without effect" State law that is in conflict with it (*McCulloch v Maryland*, 4 Wheat [17 US] 316), all preemption analysis " 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by * * * Federal Act unless that [is] the clear and manifest purpose of Congress' " (*Cipollone v Liggett Group*, 505 US 504, 516, quoting *Rice v Santa Fe El. Corp.*, 331 US 218, 230). In the absence of an express declaration by Congress, preemption will only be found "if that law actually conflicts with federal law * * * or if federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it" ' [citation omitted]." (*Cipollone v Liggett Group, supra*, at 516.)

Bausch & Lomb's argument that, in spite of the absence of a Federal private right of action, plaintiff's State causes of action were preempted, is based on the preemption provisions of 21 USC § 360k (a), which provides, in pertinent part:

"[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

"(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and

"(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act."

While this appeal was pending, the Supreme Court of the United States, in *Medtronic, Inc. v Lohr* (518 US —, 116 S Ct 2240, *supra*), dealt with the related issue of whether the fact that a Class III medical device (in that case a pacemaker lead) had gone through the premarket notification process necessary to establish substantial equivalence to a device already on the market meant that State tort law was preempted. The Court recognized the ambiguity of section 360k (a) (*supra*, 518 US, at —, —, 116 S Ct, at 2250, 2255 ["That provision makes clear that federal requirements may preempt state requirements, but it says next to nothing about just when, where, or how, they may do so" (*supra*, 518 US, at —, 116 S Ct, at 2260 [Breyer, J., concurring in part])]), and held that the State causes of action based on violation of Federal standards, defective design, negligent manufacture, failure to warn and strict products liability were not preempted by Federal law, with four Justices dissenting as to the causes of action for negligent manufacture and failure to warn.

Plaintiff argues that the Court's holding in *Medtronic* disposes of the instant matter and demonstrates that all of her State causes of action remain viable. However, as defendants point out, the process prescribed under Federal law for satisfying the requirements for premarket notification that the Court dealt with in *Medtronic* is significantly different from that of obtaining a PMA. Thus, we must now consider whether the Court's reasoning in *Medtronic* finding that Congress had not intended the premarket notification process to preempt the States from enforcing State tort law as it relates to medical devices similarly extends to situations in which the Federal Government has carried out a full PMA review.

Since the Federal preemption statute (*id.*) leaves the question of when State common-law causes of action would be preempted unanswered, the Court held that we should turn to the FDA's regulations for guidance in ascertaining whether or not the MDA will have preemptive effect (*Medtronic, Inc. v Lohr, supra*, 518 US, at —, 116 S Ct, at 2255). Both the major-

ity (518 US, at —, 116 S Ct, at 2257) and Justice Breyer, writing separately in his concurring in part opinion (518 US, at —, 116 S Ct, at 2260-2261), point to 21 CFR 808.1 (d), which states:

"State or local requirements are preempted only when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device* under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521 (a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521 (a) of the act.

"The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

"(1) Section 521 (a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code [warranty of fitness]), or to unfair trade practices in which the requirements are not limited to devices.

"(2) Section 521 (a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act * * *

"(6) (i) Section 521 (a) does not preempt State or local requirements respecting general enforcement, e.g., requirements that State inspection be permitted of factory records concerning all devices * * *

"(ii) Generally, section 521 (a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition [may] be preempted" (emphasis supplied).

Thus, the initial question in determining whether there is preemption of State requirements, including State common-law causes of action, under section 360k (a) is whether the Federal Government has itself set down sufficiently "specific"

requirements.[3] Only if such specific requirements have been established is it necessary to analyze the State or local requirement to determine whether it is the type of requirement that the statute was intended to preempt. As Justice Breyer pointed out, "[T]he regulation's word 'specific' does narrow the universe of federal requirements that the agency intends to displace at least some state law" (518 US, at —, 116 S Ct, at 2261).

Applying this analysis to the Federal requirements that are encompassed in the PMA review at issue here, we find that, while a PMA review is considerably more rigorous and detailed than the premarket notification process at issue in *Medtronic*, it is, in fact, no more "specific" a requirement.

We recognize that the statute (*supra*, n 1) and regulations (*see*, 21 CFR part 814) that governed the PMA process conducted herein call for a very elaborate review of the device. However, both the statute and the regulations are applicable across the board to any device which might be subject to the PMA process. There are no Federal regulations that specifically relate to or set out requirements for extended wear contact lenses.

While, as defendants argue, the individual PMA review of their product was quite detailed, and the postmarket requirements that were imposed as part of their premarket approval were both elaborate and specific, we find that this type of ad hoc specificity imposed as part of the individual review process is not enough to preempt State law (*see, Kennedy v Collagen Corp.*, 67 F3d 1453, 1459, *cert denied* — US —, 116 S Ct 2579 ["The fact that the premarket approval process involves specific requirements, *see* 21 C.F.R. § 814, 820, must not be confused with the premarket approval requirement itself acting as a *specific* requirement"]). There have been no steps taken by the FDA to issue regulations that are specific to this device and that will be universally applied to similar devices. Only

---

3. Although the plurality (Justices Stevens, Kennedy, Souter and Ginsburg) held in *Medtronic* that State common-law causes of action would only rarely, if ever, be preempted by the MDA (*supra*, 518 US, at —, 116 S Ct, at 2259), Justice Breyer, concurring in part and writing separately, specifically declined to join in that part of the plurality's holding. That part of the plurality's reasoning that was joined in by Justice Breyer, and therefore supported by a majority, was based not simply on an analysis of whether the State provision which was allegedly preempted was specific enough to constitute a "requirement" but on a "careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement" (518 US, at —, 116 S Ct, at 2257-2258).

that type of specific regulation by the Federal Government could constitute a requirement within the meaning of the MDA (*see, Committee of Dental Amalgam Mfrs. & Distribs. v Stratton,* 92 F3d 807, *cert denied* — US —, 117 S Ct 754; *Kennedy v Collagen Corp.,* 67 F3d 1453, *cert denied* — US —, 116 S Ct 2579, *supra; Comeau v Heller,* 945 F Supp 7, 15 [D Mass]; *Walker v Johnson & Johnson Vision Prods.,* 217 Mich App 705, 552 NW2d 679; *but see, Kernats v Smith Indus. Med. Sys.,* 283 Ill App 3d 455, 465, 669 NE2d 1300, 1308-1309, *appeal denied* 169 Ill 2d 569, 675 NE2d 634; *Green v Dolsky,* 546 Pa 400; *Armstrong v Optical Radiation Corp.,* 50 Cal App 4th 580, 57 Cal Rptr 2d 763 [Ct App 2d Dist]).

Moreover, while a number of Federal circuit courts had held, prior to the Supreme Court's decision in *Medtronic (supra),* that the PMA process does preempt State tort actions (*see, e.g., Michael v Shiley, Inc.,* 46 F3d 1316 [3d Cir], *cert denied* — US —, 116 S Ct 67; *Martello v CIBA Vision Corp.,* 42 F3d 1167 [8th Cir], *cert denied* 515 US 1161; *Stamps v Collagen Corp.,* 984 F2d 1416 [5th Cir], *cert denied* 510 US 824), those decisions can only be seen as having very limited import in light of the Supreme Court's subsequent narrow interpretation of section 360k in *Medtronic.* "The Supreme Court was well aware of the distinction between a PMA-approved device and a § 510 (k)-approved device, yet it failed to limit the *Medtronic* holding to the latter" (*Comeau v Heller,* 945 F Supp, *supra,* at 12). Indeed, in *Mitchell v Collagen Corp.* (— US —, 116 S Ct 2576), where the Seventh Circuit had found that the plaintiff's claims in common-law negligence and strict products liability were preempted because the product had undergone a PMA review (67 F3d 1268), the Supreme Court granted certiorari, vacated the judgment and remanded to the circuit court for further consideration in light of *Medtronic.*[4]

Thus, we find that the mere fact that a product has received a PMA, a procedure that was instituted with the purpose of benefitting and protecting consumers, is not a reason to forever shield its distributors from State tort actions based on harm caused by the product. Indeed, it is inconceivable that

---

4. The Court also remanded in several cases involving the related issue of whether State tort actions based on injuries caused by a device that had received an Investigational Device Exemption (*supra,* n 2) under the MDA were preempted (*Mentor Corp. v Feldt,* — US —, 116 S Ct 2575; *English v Mentor Corp.,* — US —, 116 S Ct 2575; *Mentor Corp. v Bingham,* — US —, 116 S Ct 2577). The Sixth Circuit has since held that such actions are preempted (*Martin v Telectronics Pacing Sys.,* 105 F3d 1090).

Congress would have provided for such a draconian result without making itself more explicit.

In light of our holding that the Federal regulations at issue are not sufficiently device-specific to preempt State law, it is not necessary to analyze plaintiff's causes of action to determine which of them would, in any case, survive preemption, either because they merely allege violation of Federal standards, or because they are not in "actual conflict" with any Federal requirement (*Medtronic v Lohr, Inc., supra*, 518 US, at —, 116 S Ct, at 2261 [Breyer, J., concurring in part]).

Accordingly, the order of the Supreme Court, Bronx County (Barry Salman, J.), entered February 27, 1995, which denied the motion of defendant Bausch & Lomb, Inc. for summary judgment dismissing the complaint against it on the grounds that plaintiff's claims are preempted by Federal law, should be affirmed, without costs.

SULLIVAN, J. P., MILONAS, NARDELLI and WILLIAMS, JJ., concur.

Order, Supreme Court, Bronx County, entered February 27, 1995, affirmed, without costs.