Debbie P. HAIDAK, Plaintiff,

v.

COLLAGEN CORPORATION,
Defendant.

No. Civ.A. 98–30056–FHF.

United States District Court,
D. Massachusetts.

Oct. 8, 1999.

Steven L. Hoffman, Sugarman & Sugarman, Boston, MA, for Debbie P. Haidak, plaintiff.

Joe W. Redden, Jr., W. Curt Webb, Houston, TX, Daniel E. Rosenfeld, Kirkpatrick & Lockhart LLP, Boston, MA, Judith G. Dein, Kirkpatrick & Lockhart, Boston, MA, for Collagen Corporation, defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

Plaintiff Debbie P. Haidak sued defendant Collagen Corporation ("Collagen") for injuries she allegedly suffered from injections of bovine collagen manufactured and sold by Collagen as Zyderm and Zyplast. Haidak's complaint claims negligence in Count I, breach of an implied warranty of fitness in Count II, breach of an implied warranty of merchantability in Count III, and violation of Mass.Gen.Laws ch. 93A in Count IV. Presently before the Court is Collagen's objection to Magistrate Judge Kenneth P. Neiman's March 31, 1999 Report and Recommendation to deny Collagen's motion for summary judgment on all four counts.

### II. STANDARD

The Court reviews the magistrate's report and recommendation denying Collagen's motion for summary judgment de novo, *see Unauthorized Practice*

*of Law Comm. v. Gordon,* 979 F.2d 11, 12–13 (1st Cir.1992), but need only review those "portions of the report or specified proposed findings or recommendations to which objection is made," 28 U.S.C. § 636(b)(1); *see United States v. Wihbey,* 75 F.3d 761, 766–67 (1st Cir.1996); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983). In conducting de novo review, the Court exercises independent consideration of the facts before it and includes both written findings of fact and a written statement of the reasons for its decision. *See United States v. Femia,* 983 F.2d 1046, 1993 WL 5893, at *4 (1st Cir. Jan 12, 1993) (Table) (de novo review of detention order). So long as the Court reviews the report and recommendation de novo, it need not enter further findings or opinions but may simply adopt the report and recommendation as its own. *See* 28 U.S.C. § 636(b)(1); *Wihbey,* 75 F.3d at 766–67; *United States v. Lieberman,* 608 F.2d 889, 901 (1st Cir.), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 673, 62 L.Ed.2d 649 (1980).

## III. DISCUSSION

After fully reviewing the record de novo, the Court adopts the magistrate's well reasoned report and recommendation as its own and incorporates it by reference into this Memorandum and Order. *See* 28 U.S.C. § 636(b)(1). The Court, nonetheless, briefly discusses why Collagen's objections to the magistrate's report and recommendation are not persuasive in this case.

### A. Premarket Approval Itself as a Specific Requirement

■ Collagen claims that the premarket approval ("PMA") process that Zyderm endured pursuant to the Medical Devices Amendments of 1976 ("MDA"), serves as a specific federal requirement preempting Haidak's common law tort claims. In light of *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), however, this argument simply fails to hold water. *See Lakie v. SmithKline Beecham,*

965 F.Supp. 49, 54 (D.D.C.1997) ("The fact that the PMA process requires certain information and mandates certain procedures from manufacturers does not transform the PMA process itself into a specific federal requirement which triggers preemption and protects a manufacturer from suit."); *Comeau v. Heller,* 945 F.Supp. 7, 12 (D.Mass.1996) ("The Supreme Court was well aware of the distinction between a PMA-approved device and a § 510(k)—approved device, yet it failed to limit the *Medtronic* holding to the latter."); *Sowell v. Bausch & Lomb, Inc.,* 230 A.D.2d 77, 84, 656 N.Y.S.2d 16 (1997) ("[W]hile a PMA review is considerably more rigorous and detailed than the premarket notification process at issue in Medtronic, it is, in fact, no more 'specific' a requirement."). As a result, the Court concludes that Collagen has not established that the PMA process is itself a specific federal requirement.

### B. *King* as Binding Precedent

Collagen next contends that *King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), mandates summary judgment in its favor. The Court, however, is bound to follow the Supreme Court's majority holding in *Lohr,* instructing that the federal requirements imposed by the Food and Drug Administration ("FDA") must be specific, even in light of the rigors imposed by the PMA process. *See Lohr,* 518 U.S. at 506–07, 116 S.Ct. 2240 (Breyer, J., concurring). Concluding that "the MDA's pre-emption provision is highly ambiguous," Justice Breyer's concurring opinion, and the majority holding, relied specifically on 21 C.F.R. § 808.1(d) to aid in its limitation of preemption to cases of "*specific* [federal] requirements applicable to a particular device." *Id.* 505–07, 116 S.Ct. 2240.

In contrast, the First Circuit's earlier opinion in *King* concluded that Congress's intent that the FDA regulations serve as "the total maximum protection afforded

the individual user" was so clear that it specifically declined to consider the FDA's preemption regulation, 21 C.F.R. § 808.1(d). *King*, 983 F.2d at 1138–39. Because the majority opinion's statement of the law in *Lohr* directly opposes the First Circuit's legal basis for its prior holding in *King*, this Court disagrees with Collagen's contention that King remains binding precedent and looks for guidance to other circuits.

### C. PMA of Zyderm and Zyplast as Specific Requirements

■ Collagen further claims that the specificity of the FDA's examination of Zyderm and Zyplast qualify its PMA of the two products as specific requirements worthy of preempting Haidak's state common law claims. The Court finds instructive the Eleventh Circuit's comprehensive treatment of PMA preemption after *Lohr* in *Goodlin v. Medtronic*, 167 F.3d 1367 (11th Cir.1999). In *Goodlin*, the court followed Justice Breyer's examination of 21 C.F.R. § 808.1(d), and concluded that federal pre-emption hinged upon "(1) the imposition of a specific federal requirement that (2) applied to a particular device and (3) focused on the safety and effectiveness of the device." *Id.* at 1372.

Of particular interest to this case is the Eleventh Circuit's conclusion that "[d]espite the specificity and considerable rigor of [the PMA application conditions set out in 21 U.S.C. § 360e(c)(1)], neither the FDA's actual review of a device and its supporting information nor the agency's eventual approval of the device imposes any ascertainable requirement upon the device." *Id.* at 1375. Rather, the FDA simply issues an approval letter and a generic insert titled "Conditions of Approval," which Collagen also received in this case. *See id.;* Defendant Collagen Corporation's Objections to U.S. Magistrate Judge's Report and Recommendation Regarding Defendant's Motion to Dismiss

or for Summary Judgment, Exhibit A. Simply stated, "because the approval itself neither reveals nor imposes any ascertainable substantive prerequisite for approval" that the Court could compare to any of Haidak's common law claims, the approval does not qualify as a specific requirement. *Goodlin*, 167 F.3d at 1376; *see Sowell*, 230 A.D.2d at 84, 656 N.Y.S.2d 16.

Collagen counters that the Texas Supreme Court's decision in *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 376 (Tex.1998), establishes that the products at issue here meet the required specificity. Because the *Worthy* decision does not address the lack of specificity in the approval letter and the conditions of approval insert, but rather focuses on the volumes of information Collagen submitted to the FDA and the FDA's conclusion that Zyderm "had been shown to be safe and effective," the Court finds *Worthy*'s conclusion unpersuasive. *See id.*

As a result, the Court concludes that the FDA's PMA process for both Zyderm and Zyplast, while rigorous, does not meet the specificity required by *Lohr* and discussed in *Goodlin*. Consequently, Collagen fails to meet its burden of establishing that the PMA process preempts Haidak's state common law claims and that it is entitled to judgment as a matter of law.[1]

### IV. CONCLUSION

For the foregoing reasons, the Court DENIES defendant Collagen's Motion for Summary Judgment.

It is So Ordered.

NEIMAN, United States Magistrate Judge.

*REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT (Docket No. 2)*

Debbie P. Haidak ("Plaintiff")'s complaint, originally filed in Berkshire Superi-

---

1. As any claim for adulteration would fall under general negligence, the Court views arguments under this theory as not new, but rather already incorporated within Haidak's negligence count.

or Court, alleges that she was injured by an adverse reaction to injections of Zyderm and Zyplast, products manufactured and sold by Collagen Corporation ("Defendant"). In Count I, Plaintiff claims that Defendant's negligence caused her personal injuries. In Count II, Plaintiff claims that Defendant breached an implied warranty of fitness for a particular purpose, and in Count III Plaintiff claims that Defendant breached an implied warranty of merchantability. In Count IV, Plaintiff alleges a violation of M.G.L. ch. 93A. Plaintiff's complaint was removed to this court on April 9, 1998.

Presently before the court is Defendant's motion to dismiss or, alternatively, for summary judgment. In essence, Defendant asserts that the the Medical Device Amendments of 1976 ("MDA") preempt Plaintiff's claims as a matter of law. Defendant argues that, since the subject products went through a rigorous premarket approval process with the Food and Drug Administration ("FDA") pursuant to the MDA, Plaintiff's state law claims would lead to inconsistent or different requirements than those imposed by the FDA, thus triggering preemption.

Defendant's motion has been referred to the court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates of the United States District Court for the District of Massachusetts. *See* 28 U.S.C. § 636(b)(1)(B). Without objection, the court informed the parties that the motion would be treated as one for summary judgment. For the following reasons, the court will recommend that Defendant's motion be denied.

## I. *STANDARD OF REVIEW*

Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The facts must be viewed in a light most favorable to the non-moving party. *Santiago–Ramirez v. Secretary of Dep't of Defense of United States*, 62 F.3d 445, 446 (1st Cir.1995). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

The factual dispute claimed by the non-moving party must be "material" and the dispute over it "genuine." A "genuine" issue is one that only a finder of fact can properly resolve because it may reasonably be resolved in favor of either party and a "material" issue is one that affects the outcome of the suit. *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 186 (1st Cir. 1998); *Collins v. Martella*, 17 F.3d 1, 3 n. 3 (1st Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 5 (1st Cir.1998). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Nav. Co.*, 974 F.2d 221, 223 (1st Cir.1992).

## II. *STATUTORY AND FACTUAL BACKGROUND*

### A.

The MDA was enacted to promote safety and effectiveness of medical devices intended for human use. The MDA requires the FDA to classify each medical device into class I, II or III. 21 U.S.C. § 360c(b)(1). Class III devices, because they pose the greatest risk, require premarket approval. 21 U.S.C. § 360e. The stated purpose of premarket approval is to enable the FDA to determine whether a proposed class III device provides reasonable assurance of safety and effectiveness:

(A) with respect to the persons for whose use the device is represented or intended,

(B) with respect to the conditions of use prescribed, recommended or suggested in the labeling of the device, and

(C) weighing any probable benefits to health from the use of the device against any probable risk of injury or illness from such use.

21 U.S.C. § 360c(a)(2).

When filing a premarket approval ("PMA") application, a manufacturer of a class III device is required to comply with numerous statutory requirements and make certain items available to the FDA.[1] In turn, the FDA is required to refer each PMA to a panel of qualified experts which studies the application and submits a report and recommendation. 21 U.S.C. § 360e(c)(2). The panel must include "persons who are qualified by training and experience to evaluate the safety and effectiveness of the devices to be referred to the panel and who, to the extent feasible, possess skill in the use of, or experience in the development, manufacture, or utilization of, such devices." 21 U.S.C. § 360c(b)(2).

The FDA must deny approval of a PMA for a class III device if:

(A) there is a lack of a showing of reasonable assurance that such device is safe under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof;

(B) there is a lack of a showing of reasonable assurance that the device is effective under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof;

(C) the methods used in, or the facilities or controls used for, the manufacture, processing, packing, or installation of such device do not conform to the requirements of section 360j(f) of this title;

(D) based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

(E) such device is not shown to conform in all respects to a performance standard in effect under section 360d of this title compliance with which is a condition to approval of the application and there is a lack of adequate information to justify the deviation from such standard.

21 U.S.C. § 360e(d)(2). Once a device has been approved for marketing, federal regulations prohibit the device from being "manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to ap-

1. Those items include:
(A) full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective;
(B) a full statement of the components, ingredients, and properties and of the principle or principles of operation, of such device;
(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of such device;
(D) an identifying reference to any performance standard under section 360d of this title which would be applicable to any aspect of such device if it were a class II device, and either adequate information to show that such aspect of such device fully meets such performance standard or adequate information to justify any deviation from such standard;
(E) such samples of such device and of components thereof as the Secretary may reasonably require, except that where the submission of such samples is impracticable or unduly burdensome, the requirement of this subparagraph may be met by the submission of complete information concerning the location of one or more such devices readily available for examination and testing;
(F) specimens of the labeling proposed to be used for such device; and
(G) such other information relevant to the subject matter of the application as the Secretary, with the concurrence of the appropriate panel under section 360c of this title, may require.
21 U.S.C. § 360e(c); 21 C.F.R. § 814.20.

proval specified in the PMA approval order for the device." 21 C.F.R. § 814.80.

In keeping with its legislative purpose, the MDA empowers the FDA to notify the public of risks presented by medical devices, 21 U.S.C. § 360h(a), require manufacturers to repair or replace defective devices, 21 U.S.C. § 360h(b), institute recall campaigns, 21 U.S.C. § 360h(c), require recordkeeping and reports of adverse reactions and injuries associated with devices, 21 U.S.C. § 360i, and require postmarket surveillance of certain devices, 21 U.S.C. § 360j. In addition, the FDA is authorized to withdraw its PMA approval if it later finds that a device is not safe and effective. 21 U.S.C. § 360e(e).

#### B.

Defendant manufactures and distributes products made from a purified form of bovine collagen developed in the early 1970s by a group of biochemists and physicians at Stanford University. Collagen is a natural protein found throughout the body which provides structural support for skin, muscle, tendons and bone. Fibers of collagen are woven together like threads in fabric to form a framework into which new cells may grow. Because the collagen in cows is very similar to that found in human skin, bovine collagen has been used for a number of years in many medical applications, such as sutures and heart valves.

Zyderm Collagen Implant ("Zyderm") and Zyplast Collagen Implant ("Zyplast") are two of Defendant's bovine collagen products which are injected under the skin to correct or improve soft tissue deficiencies that have arisen from disease, trauma or age. (Erickson Aff. (Docket No. 4) Exhibit 2.) Zyderm and Zyplast are regulated as class III medical devices under the MDA, 21 U.S.C. § 360c et *seq.*, and are to be sold to and administered by trained and approved medical personnel only.

(Erickson Aff. Exhibit 1, 10, 12.)[2] Defendant was required to obtain FDA approval of Zyderm's and Zyplast's safety and effectiveness before marketing. (Erickson Aff. Exhibit 1.)

On April 30, 1980, Defendant filed a PMA with the FDA for Zyderm, (Erickson Aff. Exhibit 2), including a complete description of its components, ingredients, properties, principles of operation, manufacturing methods, proposed labeling, animal and *in vitro* data, and the results of clinical testing in human subjects. (Erickson Aff. Exhibits 2, 5.) The FDA referred Defendant's PMA to its Surgical and Rehabilitation Devices Panel for review. (Erickson Aff. Exhibits 3, 11.) The panel initially determined that there were certain deficiencies in the PMA, and Defendant supplemented its application to address those issues. (Erickson Aff. Exhibits 3–9.) In July 1981, after more than a year of review and study, the FDA approved the PMA application and issued an order granting the Defendant permission to market Zyderm. (Erickson Aff. Exhibits 10, 11; 46 Fed.Reg. 48394 (1981).)

The FDA specifically found that Zyderm I "had been shown to be safe and effective for use as recommended in the submitted labeling." (Erickson Aff. Exhibit 11; 46 Fed.Reg. 46394 (1981).) As a condition of approval, Defendant was required to submit copies of all approved labeling in final printed form. The company was further told that it must obtain FDA approval before making any change that might adversely affect the safety or effectiveness of the device, including but not limited to the following: new indications for use; labeling changes; changes in manufacturing facilities, methods or quality control procedures; changes in sterilization procedures; changes in packaging; and changes in performance or design specifications. (Erickson Aff. Exhibit 10.)

**2.** "Drugs" and "devices" are mutually exclusive under the Food, Drug and Cosmetic Act. *Compare* 21 U.S.C. § 321(g)(1) *and* (h). *See*

*Tarallo v. Searle Pharmaceutical,* 704 F.Supp. 653, 655 (D.S.C.1988).

As a further condition of approval, the FDA ordered Defendant to conduct post-approval studies of treated patients. Defendant was also required to submit annual reports to the FDA, including all reports of *in vitro*, animal and clinical studies, investigations and tests, all written promotional materials, and a description of any changes made in the device not previously submitted in a supplemental PMA. The order further required Defendant to promptly report adverse reactions to Zyderm, as well as any incidents involving mislabeling or a failure to meet the specifications established in the application. (Id.)

In October 1984, Defendant filed a supplement to its Zyderm PMA seeking FDA approval for Zyplast, a form of Zyderm that is cross-linked with glutaraldehyde. The supplement specifically included proposed labeling for Zyplast. (Erickson Aff. Exhibit 35.) The FDA approved the PMA supplement in June 1985, and authorized the marketing of Zyplast, with conditions and requirements similar to those for Zyderm. (Erickson Aff. Exhibit 36.) Several years later, in 1991 and 1992, the FDA conducted a review of Defendant's PMA to assess the adequacy of the safety and effectiveness information therein and the appropriateness of the prior approval. (Erickson Aff. ¶ 7.) The FDA concluded that its initial approval of the Zyderm PMA was appropriate. (Erickson Aff. Exhibits 51–53.)

### C.

On March 16, 1995, Plaintiff underwent an injection of Zyderm around the eyes and Zyplast in the nasal labial fold areas, which injections were administered by Paul M. Haidak, M.D.[3] (Haidak Medical Record (Docket No. 25) Pl. Exhibit 1.) On April 20, 1995, she developed a mass in a lymph node and in her parotid gland. (Id.) The mass was surgically removed on May 22, 1995, leaving a scar. (Pl. Exhibit 2.) The pathology report indicated a lymph node with the presence of a foreign material rich in zinc phosphate. (Pl. Exhibit 3.) According to Bruce A. Woda, M.D., of the University of Massachusetts Department of Pathology, this foreign material was believed to have been introduced into the patient via injection. (Pl. Exhibit 4.) Daniel J. Carter, M.D., asserts that the lymph node removed from Plaintiff was from "the appropriate lymphatic drainage site for the area in which the patient had injected subcutaneous collagen, and [considering] the lack of clinical history for any other procedures in this area, it is reasonable to conclude that the foreign material is related to these injections." (Pl. Exhibit 5.)

### III. *DISCUSSION*

The issue before the court is whether Plaintiff's various claims of personal injury, allegedly caused by a class III medical device subject to the PMA process, are preempted by the MDA. The First Circuit and numerous other courts have addressed MDA preemption, often coming to different conclusions based on the claims pursued and the devices at issue. The First Circuit, in fact, has addressed MDA preemption with respect to one of the devices at issue here, Zyderm. *See King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.1993).

Due to the circuit split, the Supreme Court recently addressed the preemptive reach of the MDA in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Specifically, the Court addressed MDA preemption in the context of a section 510(k) approval process which governs "substantially equivalent" devices. 21 U.S.C. § 360(k). The 510(k) process has been described as follows:

Under section 510(k), devices that are shown to be substantially equivalent to a device on the market before the MDA [was] passed (a "predicate" device) can gain approval without submitting to the type of premarket approval required for

---

3. The court has not been made aware of what

relation, if any, the surgeon is to Plaintiff.

a new device. At least ninety days before marketing its device, a manufacturer must submit to the FDA information that the device has the same intended use as a pre-Amendment device and that it has the same technological characteristics. Alternatively, a device may satisfy the 510(k) process even if it has different technological characteristics, as long as these characteristics do not raise different questions of safety and effectiveness from the predicate device. If a device meets the equivalence requirement, it can enter the marketplace without further scrutiny.

Gail H. Javitt, *I've Got You Under My Skin And I Can't Get Redress: An Analysis of Recent Case Law Addressing Preemption of Manufacturer Liability for Class III Medical Devices,* 49 Food & Drug L.J. 553, 571 (1994) (footnotes excluded). The discrete issue in the present litigation is the extent to which the Supreme Court's analysis in *Lohr* shapes, if not controls, the preemption analysis where, as here, a more significantly rigorous PMA assessment is conducted by the FDA. As the Court itself acknowledged, "the § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours." *Lohr,* 518 U.S. at 478, 116 S.Ct. 2240 (citation omitted). "As one commentator noted", the Court continued, " '[t]he attraction of substantial equivalence to manufacturers is clear. [Section] 510(k) notification requires little information, rarely elicits a negative response from the FDA, and gets processed very quickly.' " *Id.* at 479, 116 S.Ct. 2240 (quoting Adler, *The 1976 Medical Device Amendments: A Step in the Right Direction Needs Another Step in the Right Direction,* 43 Food Drug Cosm.L.J. 511, 516 (1988)).

**A.**

■ The doctrine of preemption has its roots in the supremacy clause of the United States Constitution, Art. VI, Clause 2, which dictates that federal law is the "supreme law of the land." The supremacy clause renders invalid any state law which interferes with or is contrary to a valid federal statute.

■ While preemption may be either express or implied, a court will first look to the express language of the federal statute in order to determine its preemptive effect, if any. *Mendes,* 18 F.3d at 16. When a federal statute contains an express preemption provision, a court must determine the scope of preemption by a fair reading of that provision and should not look beyond it. *Cipollone v. Liggett Group,* 505 U.S. 504, 523, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Where Congress has expressly preempted certain state common law actions, its failure to provide a federal remedy will not defeat Congressional intent to preempt state law. *Lee v. E.I. DuPont de Nemours & Co.,* 894 F.2d 755, 757 (5th Cir.1990). It is noteworthy that Congress' express preemption of certain state enactments translates into an equal intent not to preempt those enactments absent from the statute's express provisions. *Id.*

The MDA contains an express preemption provision which, with certain exceptions, provides that:

no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

21 U.S.C. § 360k(a).[4] The provision reflects a concern that interstate commerce

4. Exceptions are set forth in subparagraph (b):

Upon application of a State or a political subdivision thereof, the Secretary may, by

not be unduly burdened by numerous and varying state requirements which differ from the federal government's requirements applicable to a medical device. H.R.Rep. No. 94–853 at 45 (1976).

■ As the First Circuit recognized, Congress created the MDA to balance the need to protect public health with the government's interest in allowing innovative devices to be marketed expeditiously without costs attributable to excess regulation. *King*, 983 F.2d at 1138. Thus, Congressional policy, as embodied in the MDA's preemption provisions, justifies the effective promotion and marketing of medical devices despite the potential cost to a few individuals who may lack redress for the occasional failure of the device. "Perfection is impossible and a few individuals may be denied full protection at the cost of benefitting the rest." *Id.*

The MDA's express statutory prohibition barring a state from establishing "any requirement" relating to a device which differs in any way from federal requirements is given further definition by its implementing regulations. In pertinent part, these regulations provide that "State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements." 21 C.F.R. § 808.1. The regulations define "any requirement" to include any court decision which is "different from, or in addition to, any requirement applicable to such device under any

provision of the act and which relates to the safety and effectiveness of the device or any other matter included in a requirement applicable to the device under the act." 21 C.F.R. § 808.1(b). However, State or local requirements that "affect devices" are not preempted if they are not "requirements applicable to a device" within the meaning of the MDA. *Id.*

Prior to the Supreme Court's decision in *Lohr*, the prevailing view in the First Circuit was that state tort law imposed requirements different from or in addition to federal MDA requirements. *Talbott v. C.R. Bard, Inc.*, 63 F.3d 25, 27 n. 1 (1st Cir.1995) (citing cases from the majority of courts which have examined the same question and adopted the same view). *See generally San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) ("State regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct."). However, as indicated, a split emerged in the various courts of appeals concerning the preemptive scope of the MDA. The First Circuit, in effect, applied total preemption to the claims before it, *Talbott*, 63 F.3d at 31; *King*, 983 F.2d at 1135, the Eleventh Circuit applied partial preemption, *Lohr v. Medtronic*, 56 F.3d 1335, 1338 (11th Cir.1995), and the Ninth Circuit held that the MDA did not preempt any of the state law claims at issue. *Kennedy v. Collagen Corp.*, 67 F.3d 1453 (9th Cir.1995).

### B.

*Lohr* involved a section 510(k) approval process for a "substantially equivalent" de-

---

regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) of this section, under such conditions as may be prescribed in such regulation, a requirement of such State or political subdivision applicable to a device intended for human use if—
(1) the requirement is more stringent than a requirement under this chapter which would be applicable to the device if an

exemption were not in effect under this subsection; or
(2) the requirement—
(A) is required by compelling local conditions, and
(B) compliance with the requirement would not cause the device to be in violation of any applicable requirement under this chapter.
21 U.S.C. § 360k(b).

vice, namely a heart pacemaker. Again, the instant matter focuses on a different device as well as a significantly more comprehensive review process, the PMA. For those reasons alone, *Lohr* might be said to provide only limited guidance. Still, *Lohr* addresses preemption broadly enough to be instructive.

Unfortunately, the Supreme Court's view regarding the extent to which section 360k(a) would preempt a state common law tort claim is fractured. The Court split 4–4 as to whether state common law tort claims always amount to conflicting state requirements and are thereby preempted. Justice Breyer, who provided the fifth vote to support a holding that none of the plaintiff's claims in *Lohr* were preempted, nonetheless agreed with the other four justices that certain FDA requirements *could* preempt state law. *Lohr,* 518 U.S. at 503, 116 S.Ct. 2240 (Breyer, J., concurring). Thus, while four justices of the Court indicated that, "[u]sing the term requirement, Congress clearly signaled its intent not to deprive States of any role in protecting consumers from the dangers inherent in many medical devices," *Lohr,* 518 U.S. at 489, 116 S.Ct. 2240, Justice Breyer's concurring opinion—which on several points, including the instant, became that of the majority—noted that "one could reasonably read the word 'requirement' as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law," *id.* at 504, 116 S.Ct. 2240 (Breyer, J., concurring). The only sensible result, Justice Breyer opined, is that "the MDA will *sometimes* preempt a state law tort suit." *Id.* at 503, 116 S.Ct. 2240 (emphasis added).

Although courts which have since addressed *Lohr* have come to varying conclusions regarding its meaning and scope, *see Mitchell v. Collagen Corp.,* 126 F.3d 902, 912 (7th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 467 (1998); *Oja v. Howmedica, Inc.,* 111 F.3d 782, 789 (10th Cir.1997), it is at least clear, as the Eleventh Circuit recently concluded,

that, "[i]n considering whether the MDA accords a federal obligation preemptive effect, the *Lohr* court read section 360k(a) to demand three things: (1) the imposition of a specific federal requirement that (2) applied to a particular device and (3) focused on the safety and effectiveness of the device." *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367 (11th Cir.1999).

Justice Breyer uses an example in his opinion which is informative in this regard. If a federal MDA regulation required a hearing aid to utilize a 2–inch wire, Justice Breyer hypothesized, and a state agency required use of a 1–inch wire, the state regulation would undoubtedly be preempted. 518 U.S. at 504, 116 S.Ct. 2240. It stands to reason, Justice Breyer continued, that liability predicated on any failure by a manufacturer to utilize a 1–inch wire—based on "expert testimony that use of a more than 1–inch wire is negligent"—is preempted as well. *Id.* "The effects of the state agency's regulation and the state tort suit are identical." *Id.* Thus, "[i]nsofar as the MDA preempts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also preempt a similar requirement that takes the form of a standard of care or behavior imposed by a state law tort action." *Id.*

In this court's opinion, Justice Breyer's example demonstrates just how specific a federal requirement must be in order to have a preemptive effect. Indeed, the majority opinion in *Lohr* also expressly states that "preemption under the MDA does not arise directly as a result of the enactment of the statute; rather in most cases a state law will be preempted only to the extent the FDA has promulgated a relevant federal requirement." *Id.* at 496, 116 S.Ct. 2240. Such a determination must be made by a court on a case-by-case basis. *Id.* Thus, a court must examine the relevant federal requirements and the nature of each claim at issue to evaluate whether the state law indeed conflicts with federal law. As Jus-

tice Breyer explained, a state requirement would be preempted only when " 'specific [federal] requirements applicable to a particular device' made 'any existing divergent state ... requirements applicable to the device different from, or in addition to, the specific [federal] requirements.' " *Id.* at 506, 116 S.Ct. 2240 (quoting 21 C.F.R. § 808.1(d)).

### C.

Defendant moves for summary judgment on the grounds that the rigorous PMA process is by itself a preemptive federal requirement. Just how rigorous a process it is, Defendant claims, was recently described by the Texas Supreme Court in *Worthy v. Collagen Corp.*, 967 S.W.2d 360 (Tex.1998), *cert. denied*, 66 U.S.L.W. 3758 (June 26, 1998). Defendant's various submissions to the FDA included highly detailed information regarding:

> how the product is manufactured, what its typical immunogenic effect is, what data has resulted from clinical and serological tests, what instructions are given physicians for using the product, what instructions are given patients concerning the product. As we have already noted, Collagen's eight volumes of material were reviewed for over a year by the FDA's panel of experts. The FDA then approved Zyderm, subject to certain detailed conditions. Announcing the order granting approval, the FDA stated that Zyderm "had been shown to be safe and effective". 46 Fed.Reg. 46394 (1981). Ten years later the FDA again reviewed the product and again found it to be safe. As with other products, the FDA prohibited the manufacture or marketing of the product in a manner inconsistent with these conditions.

*Id.* at 376.

*Lohr*, however, did not address whether approval via the PMA process *ipso facto*

imposes specific federal requirements within the meaning of section 360(k). Courts since *Lohr* have been divided on the question. *Compare Mitchell*, 126 F.3d 902; *Papike v. Tambrands, Inc.*, 107 F.3d 737, 741 (9th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 166, 139 L.Ed.2d 110 (1997); *Martin v. Telectronics Pacing Sys., Inc.*, 105 F.3d 1090, 1096 (6th Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 850, 139 L.Ed.2d 751 (1998); *Lake v. TPLC*, 1 F.Supp.2d 84, 86 (D.Mass.1998); *Fry v. Allergan Medical Optics*, 695 A.2d 511 (R.I.), *cert. denied*, — U.S. —, 118 S.Ct. 374, 139 L.Ed.2d 291 (1997); *Steele v. Collagen Corp.*, 54 Cal.App.4th 1474, 63 Cal.Rptr.2d 879 (1997), *with Goodlin*, 167 F.3d at 1375; *Kennedy*, 67 F.3d at 1458–60; *Lakie v. SmithKline Beecham*, 965 F.Supp. 49 (D.D.C.1997); *Sowell v. Bausch & Lomb, Inc.*, 230 A.D.2d 77, 656 N.Y.S.2d 16 (N.Y.App.Div.1997). The First Circuit has not yet had the opportunity to address the issue.

Pre–*Lohr*, however, the First Circuit utilized language in *King* which, at first blush, might be deemed on point. There, as indicated, the device at issue was Zyderm, a class III device at issue here. In concluding that the MDA preempted the plaintiff's state common law claims, the First Circuit noted that the FDA retained "rigid control over the entirety of the labeling and packaging of class III products." *King*, 983 F.2d at 1135. As a class III device, the court stated, Zyderm was "subject to the most extensive pre-marketing approval requirements imposed by the MDA and to similarly extensive regulation post-approval." *Id.* at 1131. As a result, the court held, the MDA preempted the plaintiff's claims of warranty of merchantability, fitness for purpose and negligence in the design, manufacture, marketing and sale of the device, mislabeling of the device, misrepresentation, and failure to warn.[5]

---

5. Other pre-*Lohr* courts followed *King* in granting summary judgment to manufacturers of class III medical devices which re-

ceived premarket approval by the FDA. *See Michael v. Shiley, Inc.*, 46 F.3d 1316 (3rd Cir.1995) (heart valve); *Talbott v. C.R. Bard,*

Of course, in reaching this conclusion, the First Circuit did not have the benefit of the Supreme Court's decision in *Lohr*. Post–*Lohr*, this court cannot conclude beyond peradventure of doubt that the First Circuit's decision in *King* would necessarily be the same. Moreover, in this court's opinion, it was not the isolated fact that Zyderm went through premarket approval that led the First Circuit to find preemption. The First Circuit was more inquisitive than that. Whether that inquiry can now be said to fully comport with the mandates of *Lohr* is another question.

As indicated, Justice Breyer's keystone opinion in *Lohr* makes clear how highly specific the federal regulatory scheme must be in order to preempt a state tort claim. In this court's view, the PMA process, standing alone, does not have that effect. The process merely results in a finding that a manufacturer's submissions have reasonably assured the FDA of a device's safety and effectiveness. By itself, the process does not reveal what, if any, specific requirement the FDA may have relied on in order to approve the device for marketing. As the Supreme Court explained, "the [MDA] statute and regulations ... require a careful comparison between the allegedly preempting federal requirement and the allegedly preempted State requirements to determine whether they fall within the intended pre-emptive scope of the statute and regulations." *Lohr*, 518 U.S. at 500.[6] Accordingly, the court simply cannot recommend as a matter of law that a cause of action arising out of a malfunctioning medical device is squarely preempted by the MDA simply because it was subjected to a PMA process.

 Unfortunately for Defendant, its argument at this stage of the litigation barely goes beyond its assertion that the PMA process, as applied to both Zyderm and Zyplast, created a regulatory framework which preempts Plaintiff's state law claims. Granted, Defendant cites cases which purport to have undertaken the full scope of the analysis with respect to Zyplast and Zyderm. *See Mitchell*, 126 F.3d at 912; *Worthy*, 967 S.W.2d at 376. But those decisions addressed other plaintiffs' claims in other contexts. More specificity is needed for Defendant to prevail with respect to Plaintiff's claims in this case. While the PMA process can impose specific regulatory requirements, a party claiming preemption still "must demonstrate that 'there is a conflict between the state and federal regulations of the medical devices which threatens to interfere with a specific federal interest.'" *Mitchell*, 126 F.3d at 913 (quoting *Hernandez v. Coopervision, Inc.*, 691 So.2d 639, 641 (Fla.App. 1997).). The court cannot undertake this analysis on its own.

Defendant's broad assertions in its motion for summary judgment are complicated by the generality of Plaintiff's claims, at least as set forth in her complaint. The imprecision of those claims makes it even more difficult for the court to compare her state claims with the federal requirements which Defendant asserts exist. If anything, Plaintiff has opposed Defendant's motion in much the same way as Defendant has pursued it, addressing the matter as if the only question before the court is

865 F.Supp. 37 (D.Mass.1994) (heart catheter). *Bravman v. Baxter Healthcare Corp.*, 842 F.Supp. 747 (S.D.N.Y.1994) (heart valve); *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015, 1023 (E.D.Mich.1993) (heart valve); *Reiter v. Zimmer, Inc.*, 830 F.Supp. 199 (S.D.N.Y.1993) (bone cement).

**6.** Interestingly enough, other commentators have asserted that, because the MDA did not preempt common law claims in *Lohr*, virtually no common law or state statutory claims

will be preempted. *See* Rachel Tumidolsky, *How Medtronic v. Lohr Has Redefined Medical Device Regulation and Litigation*, 65 Defense Counsel J. 268 (1998). *But see* Suzanne Darrow Kleinhaus, *Medtronic v. Lohr: For Want of a Word, The Patient Was Almost Lost—Fixing the Mischief Caused in Cipollone by Dividing the Preemption Stream*, 53 Food D.L.J. 297 (1998). In the court's opinion, this line of reasoning is as strained as Defendant's omnibus assertion.

whether the PMA process itself—not any requirements which arose as a result of that process—mandates preemption.

Even when viewing the case at bar through the lens of the First Circuit's decision in *King*, the court cannot render a judgment as a matter of law. While *King* implies a broad preemptive sweep, it is apparent to the court that *King* is factually distinct from the instant matter. There, the plaintiff's negligence claim, indeed all her claims, arose out of an unwanted autoimmune reaction to Zyderm. As the First Circuit made clear, the FDA was especially involved in the labeling process regarding the inclusion of contraindications regarding autoimmune reactions. *King*, 983 F.2d at 1135. The *King* plaintiff's allegations derived from the fact that Defendant failed to reveal known dangerous propensities of Zyderm despite explicit FDA directives to do so. *Id.* at 1132. In the instant matter, the gravamen of Plaintiff's claim is very different. Although Plaintiff advances a very generalized complaint—that Defendant was "careless and negligent in the design, manufacture, distribution, sale and/or conveyance of the product" (Compl.¶ 5)—the core of her claim is that the Zyderm migrated from the injection site, an unintended result of which both she and the FDA were unaware.[7]

Although the court is loathe to address Plaintiff's claim of migration in any detail, it appears that the claim, as so framed, might be able to avoid the broad preemptive bar of the MDA. Nothing in the record to date suggests that the FDA enacted specific requirements regarding the standard of care necessary to obviate product migration.[8] Accordingly, based on the record presently extant, the court will recommend that Plaintiff's negligence and warranty claims, Counts I, II and III, continue forward with regard to her allegations that the product was adulterated and, also, migrated from the injection site.

The preemption issue relative to Plaintiff's section 93A claim, that Defendant engaged in unfair and deceptive trade practices, can be dealt with in short order. Congress has spoken with unmistakable clarity that Section 360k(a) "does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices ... or to unfair trade practices in which the requirements are not limited to devices." Given that the court has recommended that Plaintiff's claims, as specified, continue forward, the chapter 93A claim which arises from those claims should likewise continue forward at present. *King* itself provides support for the conclusion that allegations of unfair or deceptive trade practices based upon what amounts to "non-label" warranties, are not necessarily within the preemptive scope of the MDA. *King*, 983 F.2d at 1135.

## IV. *CONCLUSION*

For the reasons stated, and as circumscribed, the court recommends that Defendant's motion for summary judgment be DENIED.[9]

March 31, 1999.

---

7. In addition, Plaintiff adverted to a claim of adulteration both in her papers and at oral argument. In essence, Plaintiff claims that a foreign material, zinc, was found at the site to which the Zyderm allegedly migrated. (Pl. Mem.Supp.Summ.J. at 2; Pl. Exhibit 5.) As Defendant necessarily concedes, a claim of this nature evades the preemptive scope of the MDA. *See King*, 983 F.2d at 1135; 21 C.F.R. § 808.1(d)(6)(ii).

8. The only information which addressed the potential migration of Zyderm and provided to the court, and presumably to the FDA, was contained in what has been described by Defendant as a patient brochure. (*See* Def. Exhibits 2, 14, 31.) The brochure asserts that, "once established in the skin Zyderm Collagen does *not* move. It becomes part of the skin's own Collagen and *does not migrate* into other parts of the body." (Def. Exhibit 24 at 2) (emphasis added). These representations stand alone. There is no evidence of record to suggest that Defendant provided any information to the FDA which would have given it the ability to test this claim.

9. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.